IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

UNITED STATES OF AMERICA )
)
)
v. ) Criminal No. 3:10CR170-21–HEH
)
CHRISTOPHER I. TIMBERS, )
)
Defendant. )

MEMORANDUM OPINION
(Granting Motion for Severance)

On June 10, 2010, Defendant Christopher I. Timbers ("Timbers") was indicted on

Counts One through Five and Count Seven of a twelve-count Indictment.[1]  Timbers filed

this Motion for Severance on July 29, 2010, asking this Court to sever the trial of Count

Five (the Civil Rights Violation) from the balance of the Indictment.  Following oral

argument on September 2, 2010, this Court took the matter under advisement.[2]  For the

reasons stated below, Timbers's Motion will be granted.

I. BACKGROUND

Timbers is alleged to be a member of the Manassas/Shenandoah Valley Chapter of

the American Outlaws Association ("the Outlaws").  As alleged in the Indictment, the

Outlaws is a criminal organization whose members and associates engaged in criminal

acts involving murder, attempted murders, robberies, assaults, extortion, arson, witness

---

[1] The government filed a Superseding Indictment on September 15, 2010 (Dk. No. 385), which reduced the
Indictment to fourteen defendants and seven counts.  Counts One through Seven in the Superseding Indictment are
consistent with Counts One through Seven in the original Indictment.  Accordingly, severance of Counts Five and
Six from the Superseding Indictment will have the same effect as if those Counts had been severed from the original
Indictment.
[2] Codefendants Thomas Petrini, Mark Jason Fiel, Mark Steven Fiel, and Joseph Allman filed similar motions on
parallel grounds.  This Court reserved judgment until all arguments could be heard to ensure uniform disposition.

intimidation, narcotics violations, illegal gambling, and weapons violations, in the
Eastern District of Virginia and elsewhere.

On June 10, 2010, Timbers and twenty-six others were named in a twelve-count
Indictment.  Timbers was named in Counts One through Five and Count Seven, which
specifically charged him with Conspiracy to Violate the Racketeering Influence and
Corrupt Organization Act ("RICO"), in violation of 18 U.S.C. § 1962(d); Conspiracy to
Commit Violence in Aid of Racketeering, in violation of 18 U.S.C. § 1959(a)(6);
Violence in Aid of Racketeering, in violation of 18 U.S.C. §§ 1959 and 2; Possession of a
Firearm in Furtherance of a Crime of Violence, in violation of 18 U.S.C. §§ 924(c) and 2;
a Civil Rights Violation, in violation of 18 U.S.C. § 245(b)(2)(F); and Possession of a
Firearm by a Felon and Unlawful User of Controlled Substances, in violation of 18
U.S.C. §§ 922(g)(1) and (3), respectively.

All but five of the twenty-seven named codefendants were charged in Count One,
which charged Conspiracy to Violate the Racketeering Influence and Corrupt
Organization Act ("RICO"), in violation of 18 U.S.C. § 1962(d).  The Indictment alleged
eleven overt acts in furtherance of that conspiracy.  While the means and methods
allegedly employed in furtherance of the conspiracy varied, the overarching purpose was
to keep rival motorcycle gangs and others in fear of the Outlaws, encourage an
atmosphere of violence within the Outlaws, and enrich and expand the territory and
prestige of the Outlaws through intimidation, violence, and threats of violence.  One of

the alleged overt acts formed the basis of Counts Five and Six,[3] and is the subject of this Motion.

On or about November 20, 2008, Timbers and codefendant Mark Jason Fiel allegedly assaulted a black male at the Hard Times Café in Fredericksburg, Virginia. Mark Jason Fiel called the victim over to his table to request a light for his cigarette. When the victim complied, Mark Jason Fiel punched him in the face, knocking him onto the floor.  As the victim attempted to get up, Timbers struck him again in the face.  The victim suffered a broken nose and a fractured eye socket, and required surgery to repair his injuries.  The victim was not affiliated with any rival motorcycle gang.

After the assault, Mark Jason Fiel, talking to undercover agents, said something to the effect of, "I wasn't going to get laid tonight, so I might as well hit a nigger." (Indictment ¶ 32.)  Mark Jason Fiel's father—codefendant Mark Steven Fiel—then purportedly intimidated witnesses to lie to law-enforcement officials about the incident.

On or about December 14, 2008, and January 17, 2009, Mark Steven Fiel allegedly directed undercover agents to falsely testify in court that the victim started the fight so that Timbers could claim self defense.  During the December 14 conversation, Mark Jason Fiel supposedly uttered additional racial epithets.

On or about March 9, 2009, Timbers allegedly asked an undercover agent who witnessed the assault to lie about the incident to law enforcement and Timbers's lawyer so that Timbers could claim self defense.

---

[3] Count Six charges Mark Steven Fiel with Witness Tampering, in violation of 18 U.S.C. § 1512(b)(3).  Although Defendant Timbers is not charged in Count Six, the underlying facts are closely aligned with Count Five.

Based on these events, Count Five of the Indictment charged Timbers and Mark Jason Fiel with a Civil Rights Violation, in violation of 18 U.S.C. § 245(b)(2)(F), and Count Six charged Mark Steven Fiel with Witness Tampering, in violation of 18 U.S.C. § 1512(b)(3).

Timbers, Mark Jason Fiel, Mark Steven Fiel, and codefendants Thomas Petrini and Joseph Allman (collectively, "the Defendants") filed motions to sever the trial of Counts Five and Six from the balance of the twelve-count Indictment.  The Defendants contend that the assault at the Hard Times Café had nothing to do with the Outlaws or its alleged conspiracy.  The Defendants argue that the Outlaws organization does not have—and the government did not charge—any racially-discriminatory purpose.  Moreover, the Defendants assert, the victim of the assault was not a member of a rival gang, and thus the incident was not one of the conspiratorial methods of using intimidation, violence, and threats against suspected members of rival gangs.

In the Defendants' view, the incident was a simple bar fight which happened to involve two members of the Outlaws.  At oral argument, even the government conceded that the assault was "a random show of violence."[4]  (Petrini Hr'g Mot. Severance Tr. 10, Sept. 3, 2010.)  Accordingly, the Defendants argue that Count Five was improperly joined under Rule 8 of the Federal Rules of Criminal Procedure.  In the alternative, the Defendants argue that even if joinder was proper, Rule 14 warrants severance because any probative value is substantially outweighed by the danger of unfair prejudice.

---

[4] The government added, however, that the assault alleged in Count Five was consistent with the goals, means, and methods outlined in Count One.

4

The government counters that Timbers and Mark Jason Fiel, who sported Outlaws patches and colors at the time of the assault, intended the unprovoked assault to be a public demonstration of Outlaws authority. Consequently, the government maintains that this action furthered the objectives of the enterprise.

## II. ANALYSIS

A. *Rule 8(a)*

Rule 8(a) of the Federal Rules of Criminal Procedure permits joinder of offenses as separate counts "if the offenses charged . . . are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." Fed. R. Crim. P. 8(a). The Fourth Circuit has interpreted Rule 8(a) to permit "very broad joinder," requiring only that "joined offenses have a 'logical relationship' to one another." *United States v. Cardwell*, 433 F.3d 378, 385 (4th Cir. 2005) (quoting *United States v. Mackins*, 315 F.3d 399, 412 (4th Cir. 2003); *United States v. Hirschfeld*, 964 F.2d 318, 323 (4th Cir. 1992)). "Such a relationship exists when consideration of discrete counts against the defendant paints an incomplete picture of the defendant's criminal enterprise." *Id.*

Rule 8(a) is not, however, "infinitely elastic." *Id.* (quoting *Mackins*, 315 F.3d at 412). Joinder of unrelated charges increases the possibility that a defendant will be convicted based on considerations other than the facts of the charged offense. *Id.* (citing *Mackins*, 315 F.3d at 412). Nevertheless, courts have a strong preference for joinder of offenses, because joinder reduces the waste of judicial and prosecutorial resources and

lessens the burden on witnesses who would otherwise need to testify at multiple trials. *Id.* (citing *United States v. Stokes*, 211 F.3d 1039, 1042 (7th Cir. 2000)).

Considering the breadth of joinder permitted by Rule 8(a), this Court finds that Count Five was properly joined. The Indictment charges that the Outlaws "[u]se intimidation, violence, and threats of violence against suspected members of rival gangs *and others* to preserve, enhance, and protect the Enterprise's territory and activities in the community." (Indictment ¶ 17(a) (emphasis added).) At oral argument, the government added that the purpose of the Outlaws' meeting in Fredericksburg was to recruit members from the Mongols motorcycle club and to promote the Outlaws' image in the community. The government emphasizes that Mark Jason Fiel and Timbers were wearing their Outlaws regalia at the time of the assault, and characterizes the incident as a public show of authority to highlight the Outlaws' disregard for the law and to show prospective members what kind of organization they would be joining. In the government's view, the fact that Timbers delivered a second punch bolsters the government's position, because Outlaws are expected to come to the aid of other Outlaws.

Considering the means and methods charged in the Indictment, it is not fatal to the government's position that the victim was not a member or suspected member of a rival gang. The incident underlying Count Five shares some logical relationship to the remaining counts of the Indictment, and thus joinder was proper.

6

B. *Rule 14*

Notwithstanding the fact that joinder was proper under Rule 8(a), analysis under Rule 14 appears to warrant severance of Count Five—and, consequently, Count Six[5]— from the remaining counts for trial purposes.

Rule 14(a) provides that "[i]f joinder of the offenses . . . in an indictment . . . appears to prejudice a defendant . . . the court may order separate trials of counts." Fed. R. Crim. P. 14(a). When joinder is proper under Rule 8, severance under Rule 14 should be granted only if there exists a serious risk that a joint trial would compromise a specific trial right of one of the defendants or prevent the jury from making a reliable judgment of guilt or innocence. *See Zafiro v. United States*, 506 U.S. 534, 539 (1993) (discussing the relationship between Rule 8(b) joinder and Rule 14). Such a risk might occur when evidence that should not be considered and would not be admissible against a defendant if tried alone is admitted against a codefendant. *Id.* "When many defendants are tried together in a complex case and they have markedly different degrees of culpability, this risk of prejudice is heightened."[6] *Id.* On the other hand, "defendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials." *Id.* at 540.

In this case, the events underlying Count Five involved a racial epithet— specifically, the "N word," universally regarded as the most inflammatory and racially-charged slur for African Americans—coupled with an unprovoked racially-motivated

---

[5] As the Court found and stated on the Record at oral argument, Counts Five and Six are inextricably linked.
[6] As of the writing of this Opinion, fourteen defendants of widely varying culpability have opted for a trial by jury.

assault. Given the composition and sensibilities of juries in the Richmond Division, the potential for adverse reaction and indelible prejudice from this racial encounter is extremely high. The diffusing effect of this evidence could potentially infect all defendants—particularly those not involved in this isolated incident.

Aside from the substantial risk of prejudice, the relationship of the alleged civil rights violation to the means and methods of the Outlaws' conspiracy is gossamer at best. Nowhere beyond Count Five itself does the government allege or attribute racial or other discriminatory motives to the Outlaws' conspiracy. In short, the random unexplained assault on an African American male accompanied by express racial connotations may very well prevent the jury from making a reliable determination of guilt or innocence on the other charges and as to the other defendants.

In this Court's view, the prejudicial effect of such racially-inspired actions could not be overcome with a curative instruction. As Rule 14 leaves the determination of risk of prejudice and any remedy to the sound discretion of the court, *Zafiro*, 506 U.S. at 539, this Court finds that a separate trial on Count Five is the appropriate remedy. Because Count Six is inextricably linked to Count Five, Count Six will also be severed and tried along with Count Five.

### III. CONCLUSION

Count Five was properly joined pursuant to Rule 8(a), but must nonetheless be severed because of the danger of prejudice to the Defendants. Counts Five and Six are inextricably linked, and thus Count Six must also be severed and tried with Count Five.

8

An appropriate Order will accompany this Memorandum Opinion.

                                    _____/s/_____
                                    Henry E. Hudson
                                    United States District Judge

Date: **Sept. 22, 2010**
Richmond, VA